IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

RACIE PHILLIPS                                                                           PLAINTIFF

v.                                    Case No. 2:21-cv-00166 KGB

UNITED STATES OF AMERICA                                                     DEFENDANT

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Racie Phillips brings this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b), against the United States of America (hereinafter "Defendant") alleging that, while incarcerated at the United States Bureau of Prisons ("BOP") Federal Correction Institution – Medium at Forrest City, Arkansas ("the Facility") on or about March 15, 2018, he injured his left patella tendon requiring surgery (Dkt. No. 1). The Court held a two-day bench trial on June 13 and 14, 2023 (Dkt. Nos. 18–19). Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes the following specific findings of fact and conclusions of law. The Court determines that Mr. Phillips sustained his burden of proof on his Federal Tort Claims Act claim and is entitled to the relief he seeks.

**I.       Findings Of Fact**

1.      At trial, the Court admitted into evidence Mr. Phillips's Exhibits 1 through 12 and Defendant's Exhibits 1, 1A, 2, and 3 (Dkt. Nos. 20-21).

2.      On March 15, 2018, Mr. Phillips injured his left patella tendon while playing basketball inside the Facility.

3.      Defendant's medical staff sent Mr. Phillips to the Forrest City Medical Center ("FCMC") emergency room on the same date.

4.      At FCMC, physicians diagnosed Mr. Phillips with a dislocation and unspecified fracture of the left patella. On March 16, 2018, Defendant's nurse practitioner ordered a request for a consultation with an orthopedic surgeon.

5.      During a pre-operative visit with Bret Sokoloff, M.D., on March 29, 2018, Dr. Sokoloff stated that he would proceed with left patella tendon repair on Mr. Phillips (Defendant's Ex. 1A-5).

6.      Dr. Sokoloff noted that he had requested that Defendant's medical staff provide Mr. Phillips a hinged knee brace for post-operation motion control, but Defendant's medical staff had refused the request (*Id*.). Dr. Sokoloff noted that Mr. Phillips would need staple removal in two weeks and would need to return to his office in two to three weeks for a post-operation appointment (*Id*.). Further, Dr. Sokoloff stated that he would "try to authorize for post-op visit as medically necessary." (*Id*.).

7.      At Dr. Sokoloff's deposition, which was admitted as a trial exhibit by both parties, Dr. Sokoloff testified that the note in the medical records regarding the refusal to provide the hinged brace indicated either that his office could not reach anyone at the Facility to obtain authorization or probably that the hinged brace was problematic due to metal in it; according to Dr. Sokoloff, typically prisoners cannot have braces that have metal in them (Defendant's Ex. 1A-3, at BOP 008).

8.      Dr. Sokoloff performed outpatient patella tendon surgical repair on Mr. Phillips at Methodist Le Bonheur Healthcare North Hospital ("Le Bonheur Hospital") in Memphis, Tennessee, on March 29, 2018 (Defendant's Ex. 1A-6, at BOP 423).

9. The March 29, 2018, surgery went well without complications (*Id*.). At the time of surgery, Dr. Sokoloff placed a knee immobilizer on Mr. Phillips (*Id*., at BOP 424).

10. At discharge, Mr. Phillips was instructed to wear the immobilizer at all times post-surgery, to keep the left knee straight at all times, and to use crutches (Defendant's Ex. 1A-7, at BOP 399). In addition, Dr. Sokoloff instructed Mr. Phillips that Mr. Phillips could be full weight bearing, as tolerated, to left leg while using crutches (*Id*.). Dr. Sokoloff instructed Mr. Phillips to keep his knee elevated, apply ice to the incision, and to remove the staples in two weeks (*Id*.).

11. When Mr. Phillips returned from surgery, Defendant's medical staff offered Mr. Phillips a wheelchair that did not have footrests on it. Mr. Phillips refused the wheelchair without footrests because his leg would not be supported or elevated, and he could not use it and be compliant with Dr. Sokoloff's post-surgery instructions. Defendants provided Mr. Phillips crutches.

12. Defendants did not give Mr. Phillips any medication for pain following the first patella tendon repair surgery, although records indicate that Mr. Phillips may have already been on Ibuprofen 800 milligrams for a chronic condition.

13. Defendants did not move Mr. Phillips to the first floor following his first patella tendon repair surgery. As a result, after his first patella tendon repair surgery, Mr. Phillips was required to go up five flights of stairs every day for breakfast, lunch, dinner, and any pill calls, which was a strain with crutches.

14. Mr. Phillips again requested an adequate wheelchair from Defendant's medical staff, but Mr. Phillips was told that Defendant only had a wheelchair without footrests.

3

15. During a raid at the Facility on March 30, 2018, Defendant's officers took Mr. Phillips's knee immobilizer that Dr. Sokoloff placed on him after surgery because it had four metal rods in it.

16. After his knee immobilizer was taken, Mr. Phillips attempted to address his lack of an immobilizer by submitting a request to be seen at sick call. Defendant's nurse told Mr. Phillips that this was not a sick call situation and turned Mr. Phillips away. Mr. Phillips was never able to be seen by medical personnel to ask for a new immobilizer or to ask how to follow Dr. Sokoloff's post-operative instructions to keep his knee immobile without an immobilizer.

17. Mr. Phillips filed grievances with Defendant about his immobilizer being taken, but he did not get any response to his grievances.

18. After taking the immobilizer placed on Mr. Phillips by Dr. Sokoloff, Defendant never provided Mr. Phillips with another knee immobilizer. As a result, Mr. Phillips did not have an immobilizer from March 30, 2018, until May 21, 2018.

19. Mr. Phillips changed his own dressing on his wounds following the March 29, 2018, surgery until April 13, 2018, when he was first seen by Defendant's medical personnel following his return from surgery.

20. During his April 13, 2018, appointment with Defendant's medical personnel, a nurse removed the staples in Mr. Phillips's knee. At that appointment, none of Defendant's medical personnel instructed Mr. Phillips about being non-weight bearing. Instead, Defendant's nurse took Mr. Phillips's crutches.

4

21. Mr. Phillips described the condition of his surgical wounds at the time of his April 13, 2018, encounter with Defendant's medical staff as oozing pus and blood, and he explained that the skin had started healing over the staples.

22. Mr. Phillips described the condition of his knee after the staple removal on April 13, 2018, as swollen.

23. Defendant never sent Mr. Phillips to Dr. Sokoloff for a post-operative appointment following his first patella tendon repair surgery.

24. Defendant did not provide Mr. Phillips with a wheelchair that would permit him to elevate his leg following his first patella tendon repair surgery.

25. On May 1, 2018, Mr. Phillips reported to health services with a suspected knee infection (Defendant's Ex. 1A-10, at BOP 206). Upon examination, Defendant's nurse noted no pus and no heat but some swelling to Mr. Phillips's left knee (*Id*.).

26. An x-ray on May 1, 2018, showed a "floating orthopedic plate" and a high riding patella (Defendant's Ex. 1A-11). No fracture, malalignment, or soft tissue abnormality was noted (*Id*.). Defendant's medical staff gave Mr. Phillips Bactrim, an antibiotic, and encouraged Mr. Phillips to wear his knee brace (Defendant's Ex. 1A-10, at BOP 207).

27. On May 17, 2018, Mr. Phillips reported to sick call because of swelling and pain in his knee, and Defendant's medical staff refused his sick call form and sent him back to Unit C-3.

28. On May 21, 2018, Mr. Phillips reported to health services that he was walking in the unit and heard a "pop" in his left knee (Defendant's Ex. 1A-13, at BOP 199). Mr. Phillips also noted increased temperature in the knee since before he took antibiotics (*Id*.). An x-ray revealed

"worsening prepatellar soft tissue swelling," as well as an "avulsed fracture off the inferior anterior aspect of the left patella" (Defendant's Ex. 1A-14).

29. Defendant's medical staff sent Mr. Phillips to the emergency room at FCMC the same day (Defendant's Ex. 1A-15). A CT of Mr. Phillips's left knee revealed a "possible anterolateral soft tissue abscess and surrounding cellulitis" (*Id*., at BOP 366).

30. The same day, Mr. Phillips was transferred from FCMC Le Bonheur Hospital (Defendant's Ex. 1A-16).

31. Upon admission to Le Bonheur Hospital, Dr. Sokoloff was consulted (*Id*., at BOP 328–334).

32. Dr. Sokoloff noted that Mr. Phillips had been full weight bearing without his knee immobilizer or crutches – against medical advice – for two weeks following surgery (*Id*., at BOP 328).

33. Dr. Sokoloff did not know why Mr. Phillips stopped using the immobilizer or crutches (Defendant's Ex. 3, at 10).

34. An MRI of the knee ruled out an abscess infection (1A-16, at BOP 319–20). Rather, the MRI revealed that the patella tendon was completely torn away from the kneecap (avulsion fracture) (*Id*.).

35. On this same date, Mr. Phillips underwent a second patella tendon repair of the left knee by Dr. Sokoloff (*Id*., at BOP 335–36). No infection was present (*Id*., at BOP 337). Blood in the form of a hematoma was irrigated from the knee, and the bone fragments were debrided (*Id*.). Like the first procedure, Dr. Sokoloff was able to achieve a complete repair of the tendon to the

6

bone (*Id.*, at BOP 337–38). The repair was noted to be secure, and Mr. Phillips was again placed in a knee immobilizer (*Id.*, at BOP 338).

36. Mr. Phillips remained in the hospital for four days.

37. Mr. Phillips returned to the Facility with a "brace" and a prescription for Tylenol III (Defendant's Ex. 1A-19).

38. Upon discharge from the hospital, Dr. Sokoloff ordered Mr. Phillips to wear his immobilizer at all times, elevate his left leg while in bed or in a chair, use ice to reduce swelling and pain, and "touch down" weight bearing only to left knee and foot (Defendant's Ex. 1A-16, at BOP 375).

39. Jillian Harris, Advanced Practice Registered Nurse, ordered Mr. Phillips a wheelchair and had it up front at the Facility, but once Mr. Phillips arrived, the wheelchair was not there. Mr. Phillips signed a form stating that he was refusing a wheelchair because he refused to accept a wheelchair that did not have footrests (Defendant's Ex. 1A-20).

40. Tylenol III was prescribed for Mr. Phillips following his second surgery. Mr. Phillips refused narcotic pain relief and requested Ibuprofen 800 mg (Defendant's Ex. 1A-19).

41. According to Nurse Harris, at the Facility, there are some medications that inmates must pick up in the pill line and take in front of the nurse and other medications that an inmate is permitted to have in the inmate's housing unit and to take as directed. Ibuprofen 800 milligrams is a medication that an inmate may have in his housing unit and can take himself as directed. Tylenol III is a medication that Mr. Phillips would have to obtain in the pill line.

42. Following Mr. Phillips's second patella tendon repair surgery, Defendant moved Mr. Phillips from C3 downstairs to C1.

43. After refusing the wheelchair without footrests offered by Defendant, Mr. Phillips was able to borrow another inmate's wheelchair with footrests (Defendant's Ex. 1A-21).

44. The second surgery was painful.

45. At a follow-up appointment with Defendant's medical staff on June 11, 2018, Mr. Phillips was noted to be still wearing his brace and described his pain as a seven out of ten (Defendant's Ex. 1A-21). On examination, there was still swelling to the left knee (Defendant's Ex. 1A-21). Nurse Harris gave Mr. Phillips a new wheelchair (Defendant's Ex. 1A-21).

46. On June 25, 2018, 34 days after his second surgery, Nurse Harris removed Mr. Phillips's staples (Defendant's Ex. 1A-22). Nurse Harris noted drainage from Mr. Phillips's wounds and obtained a culture (*Id.*). Nurse Harris ordered Bactrim for Mr. Phillips (*Id.*). Nurse Harris noted that Mr. Phillips had a "pending" appointment to return to Dr. Sokoloff for a post-operative visit. Mr. Phillips rated his pain as sharp and a seven out of ten (*Id.*).

47. On June 30, 2018, Mr. Phillips reported to morning pill call for antibiotics and stated that his left knee suture line had split open and was draining pus (Defendant's Ex. 1A-26). Mr. Phillips returned to medical as instructed for dressing change, and the nurse noted a small amount of drainage, that suture line was pink and not inflamed, but that Mr. Phillips's knee continued to be swollen (*Id.*). Mr. Phillips was in his wheelchair with footrests (*Id.*). He was instructed to keep his knee elevated as much as possible (*Id.*).

48. On July 9, 2018, the culture came back showing a heavy growth of Methicillin Resistant Staphylococcus Aureus (Defendant's Ex. 1A-27).

49. On July 11, 2018, Nurse Harris examined Mr. Phillips again for a follow-up on his left knee wound (Defendant's Ex. 1A-28). Mr. Phillips was in his wheelchair but was not wearing

8

his immobilizer (*Id.*).  Mr. Phillips's left knee was still slightly swollen and warm to the touch (*Id.*).  The suture site was noted to be well approximated and pink, but no drainage was noted (*Id.*).  Nurse Harris prescribed Clindamycin, a new antibiotic based on culture results, and Mr. Phillips was counseled on medication compliance and instructed to stay in his wheelchair with brace, non-weight bearing, until his return to ortho (*Id.*).

50. On August 6, 2018, Dr. Sokoloff saw Mr. Phillips for a follow up (Defendant's Ex. 1A-32).  Dr. Sokoloff noted that Mr. Phillips was not wearing his immobilizer against medical advice (*Id.*).  Mr. Phillips's surgical incision was healing properly, and he had full range of motion in his knee (*Id.*).  Dr. Sokoloff noted that, "despite non-compliance, repair appears to be intact and function good." (*Id.*).  Mr. Phillips was to continue home exercises (*Id.*).  Mr. Phillips returned his crutches to health services upon his return.

51. On October 12, 2018, Dr. Sokoloff examined Mr. Phillips again due to Mr. Phillips's report of swelling and knee pain at night (Defendant's Ex. 1A-33).  Dr. Sokoloff told Mr. Phillips that he could be fitted for another brace; otherwise, there was no need for further orthopedic medical intervention (*Id.*).

52. Every now and then, Mr. Phillips's kneecap sometimes pops out, and he must pop it back into place.

53. At the time of trial, Mr. Phillips was not taking any medication for pain.

54. At the Facility, Mr. Phillips went to medical every time his name was on the list for an appointment, and he was never written-up for failing to report to an appointment with medical staff.

55. Retired general surgeon and family practice physician William Rutledge, M.D., testified at trial. During his trial testimony, Dr. Rutledge gave all of his opinions to a reasonable degree of medical certainty based on his education, training, and experience.

56. According to Dr. Rutledge, the healing of the left patella tendon repair would not end when the staples were removed, and someone who had a patella tendon repair would need to continue to elevate the knee and be non-weight bearing to prevent swelling.

57. Dr. Rutledge testified that Defendant's medical personnel did not provide Mr. Phillips a knee immobilizer or brace and did not provide Mr. Phillips with an adequate wheelchair and crutches, which are the reasons why Mr. Phillips was noted by Dr. Sokoloff to be non-compliant.

58. In Dr. Rutledge's opinion, it was Defendant's medical staff's duty to make sure that Mr. Phillips had an immobilizer, a wheelchair with footrests, crutches, and first-floor housing following his first patella tendon repair surgery.

59. In Dr. Rutledge's opinion, Defendant's failure to provide Mr. Phillips with an immobilizer, a wheelchair with footrests, and crutches and failure to move Mr. Phillips to the first floor following his first patella tendon repair surgery caused Mr. Phillips to have a failed left patella tendon repair and to require a second operation.

60. According to Dr. Rutledge, the second repair surgery is always more difficult than the first, and during Mr. Phillips's second patella tendon repair surgery, Dr. Sokoloff had to clean out a hematoma, which is blood in the joint itself.

61. Dr. Rutledge opined that Mr. Phillips's walking and cycling following the second surgery was not against medical advice because Dr. Sokoloff advised Mr. Phillips to do self-therapy.

62. In Dr. Rutledge's opinion, it was a breach of the standard of care for Defendant's medical staff to fail to remove Mr. Phillips's staples in a timely fashion following his second patella tendon repair surgery, resulting in Mr. Phillips developing an infection.

63. According to Dr. Rutledge, because Defendant failed to treat properly Mr. Phillips requiring a second patella tendon repair operation, it places Mr. Phillips at risk for re-injury and chronic pain.

64. Ethan Schock, M.D., an orthopedic surgeon in Little Rock, Arkansas, also testified at trial and, during his testimony, offered his opinions to a reasonable degree of medical certainty.

65. Dr. Schock agrees that Mr. Phillips would not have been able to comply with Dr. Sokoloff's post-operative plan to wear the immobilizer at all times if Defendant took the immobilizer away from him.

66. Dr. Schock's opinion in this case is that the patella tendon ruptured a second time. Dr. Schock did not offer an opinion at trial as to what caused the rupture to occur. Dr. Schock considers Mr. Phillips's second surgery for his ruptured patella to be a complication.

**II.    Conclusions Of Law**

67. Mr. Phillips's FTCA claims are governed by Arkansas state law because that is where the negligent act or omission occurred. *Day v. United States*, 865 F.3d 1082, 1086 (8th Cir. 2017) (citing *Chapa v. United States*, 497 F.3d 883, 887 n. 2 (8th Cir. 2007)).

68. To succeed on an action for medical injury under the Arkansas Medical Malpractice Act, Mr. Phillips must prove the applicable standard of care and a deviation therefrom, unless the asserted negligence is a matter of common knowledge. Ark. Code Ann. §16-114-206(a)(1)-(3).

69. Under Arkansas law, "expert testimony is required only when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge, when the applicable standard of care is not a matter of common knowledge, and when the jury must have the assistance of experts to decide the issue of negligence." *Haase v. Starnes*, 915 S.W.2d 675, 677-78 (Ark. 1996).

70. The trial court has broad discretion to determine whether one qualifies as an expert. *Phillips v. Clark*, 759 S.W.2d 207, 210 (Ark. 1988). The Arkansas Supreme Court has ruled that, under the Arkansas Medical Malpractice Act, the locality rule is the standard of care in Arkansas. *Turner v. Faulkner County, Ark.*, 78 F.4th 1025 (8th Cir. 2023) (citing *Gambill v. Stroud*, 531 S.W.2d 945, 949 (1976)).

71. The applicable Arkansas statute provides in relevant part:

> (a) In any action for medical injury, when the asserted negligence does not lie within the jury's comprehension as a matter of common knowledge, the plaintiff shall have the burden of proving:
>
> (1) By means of expert testimony provided only by a medical care provider of the same specialty as the defendant, the degree of skill and learning ordinarily possessed and used by members of the profession of the medical care provider in good standing, engaged in the same type of practice or specialty in the locality in which he or she practices or in a similar locality;
>
> (2) By means of expert testimony only by a medical care provider of the same specialty as the defendant, that the medical care provider failed to act in accordance with that standard; and

>  (3) By means of expert testimony provided only by a qualified medical expert that as a proximate result thereof the injured person suffered injuries that would not otherwise have occurred.

Ark. Code Ann. §16-114-206(a)(1)-(3); *see also Broussard v. St. Edward Mercy Health Systems, Inc.*, 386 S.W.3d 385, 390 (Ark. 2012) (striking language in the statute which required that the expert testimony be "provided only by a medical care provider of the same specialty as the defendant" and upholding the remaining language of the statute).

72.     Under the statute, "medical care provider" includes, in pertinent part, a "nurse . . . lawfully providing professional medical care or services." Ark. Code Ann. §16-114-201(2).

73.     Under Arkansas law, in treating Mr. Phillips, the BOP's nurses and staff must possess and apply with reasonable care the degree of skill and learning ordinarily possessed and used by members of their profession in good standing, engaged in the same type of service in the locality in which they practice, or in a similar locality. *See* Ark. Model Jury Inst., Civil AMI 1501 (2024).  A failure to meet this standard is negligence. *Id*.

74.     Proximate causation is an essential element for a cause of action in negligence. *Clark v. Ridgeway*, 914 S.W.2d 745, 750 (Ark. 1996). The Arkansas Supreme Court has held that the Arkansas Medical Malpractice statute implements the traditional standard that, but for the tortfeasor's negligence, the plaintiff's injury would not have occurred. *Ford v. St. Paul Fire & Marine Ins. Co.*, 5 S.W.3d 460, 462-63 (Ark. 1999). Vague and conclusory statements that defendant did not conform to the standard of care do not meet the burden. *Fryar v. Touchstone Physical Therapy, Inc.*, 229 S.W.3d 7, 13 (Ark. 2006).

75. The Arkansas Supreme Court has held that expert opinions by medical care providers are to be stated within a reasonable degree of medical certainty. *Young v. Gastro-Intestinal Ctr., Inc.*, 205 S.W.3d 741, 745 (Ark. 2005); *Ford*, 5 S.W.3d at 462-63.

76. This Court acknowledges that, during a bench trial, the Court is responsible for determining witnesses' credibility and resolving conflicts in the testimony. *See Wright v. St. Vincent Health System*, 730 F.3d 732, 739 (8th Cir. 2013).

### III. Analysis Of Claims

77. Based on the record before the Court, weighing all of the evidence and the credibility of the witnesses, the Court concludes that Defendant's medical care providers failed to act within the standard of care when treating Mr. Phillips's patella tendon injury. Ark. Code. Ann. § 16-114-206(a)(2).

78. Specifically, Defendant's medical care providers were not within the standard of care in failing to provide to Mr. Phillips an immobilizer, a wheelchair with a footrest that permitted him to elevate his left leg, crutches, and first-floor housing following his first patella tendon repair surgery resulting in Mr. Phillips suffering a second ruptured patella tendon and necessitating a second repair surgery. Ark. Code Ann. § 16-114-206(a)(2).

79. Defendant's medical care providers also were not within the standard of care in delaying the removal of Mr. Phillips's staples following the second surgery resulting in an infection to the wound site and a delay in Mr. Phillips's recovery. Ark. Code. Ann. § 16-114-206(a)(2).

80. The failure of Defendant's medical care providers to provide to Mr. Phillips a knee immobilizer, a wheelchair with a footrest that permitted him to elevate his left leg, crutches, and

first-floor housing following his first patella tendon repair surgery was the proximate cause of his second ruptured patella tendon and the additional problems Mr. Phillips sustained following the original surgical repair of his patella tendon. Ark. Code. Ann. § 16-114-206(a)(3).

**IV.    Damages**

81.    In his complaint, Mr. Phillips seeks $250,000.00 for "severe and physical damages that resulted in extreme distress and mental anguish; and for permanent injuries and future pain and suffering" (Dkt. No. 1, at 6).

82.    Based on the record before the Court, weighing all of the evidence and the credibility of the witnesses, the Court concludes that Defendant's medical care providers failed to act within the standard of care when treating Mr. Phillips's patella tendon injury and that the failure of Defendant's medical care providers proximately caused injury and damage to Mr. Phillips.

83.    Mr. Phillips's pain following his second surgery was more significant than his pain following his first surgery. However, Mr. Phillips refused narcotic pain medication and requested Ibuprofen 800 milligrams. Mr. Phillips was not taking any kind of pain medication at the time of trial. Mr. Phillips's kneecap pops out sometimes, but he pops it back in.

84.    During a follow-up appointment with Dr. Sokoloff in August 2018, approximately three months after his second surgery, Mr. Phillips reported being satisfied with his functional status and pain resolution (Plaintiff's Ex. 3, at Phillips 20).

85.    When Mr. Phillips returned for a follow-up with Dr. Sokoloff in October 2018, he complained of pain at night and swelling in his knee (*Id.*, at 23). Dr. Sokoloff noted that Mr. Phillips had a normal gait and good mobility (*Id.*). Dr. Sokoloff advised Mr. Phillips that he could

15

be fitted for another brace; otherwise, there was no need for further orthopedic medical intervention (*Id.*).

86. According to Dr. Sokoloff, Mr. Phillips had a good outcome from the second patella tendon repair surgery, and Dr. Sokoloff noted during his deposition that in August and October 2018 that Mr. Phillips had regained function of the left knee (Defendant's Ex. 3, at 12). Dr. Sokoloff released Mr. Phillips from his care without restrictions (Defendant's Ex. 3, at 15).

87. Dr. Rutledge stated that Mr. Phillips did not suffer any permanent injury from the infection that he suffered following the second patella tendon repair surgery. Dr. Rutledge opined, however, that Mr. Phillips is at risk for re-injury and chronic pain.

88. Mr. Phillips did not testify to any scars as a result of the surgeries.

89. "There is no definite and satisfactory rule to measure compensation for pain and suffering[,] and the amount of damages must depend on the circumstances of each particular case." *Hamby v. Haskins,* 630 S.W.2d 37, 40 (1982). "Compensation for pain and suffering must be left largely to the sound discretion of a trial jury and the conclusion reached by it should not be disturbed unless the award is clearly excessive." *Id.* (concluding that the award of damages was not "so shocking that we will order a remittitur"). As to future pain and suffering, "[e]vidence of future pain and suffering and permanent disability must be established with reasonable certainty[,] and it must not be left up to speculation or conjecture on the part of the jury." *Handy Dan Home Imp. Ctr., Inc.-Arkansas v. Peters,* 689 S.W.2d 551, 552 (Ark. 1985). Reasonable certainty is more than a "good possibility." *Bailey v. Bradford,* 423 S.W.2d 565, 567 (Ark. 1968). Expert testimony is not necessarily required to establish future pain and suffering; lay testimony can suffice. *Id.* at 566–67.

90. Following the bench trial and having considered the entire record and the findings of fact and conclusions of law set out in this Order, the Court determines that there is evidence on the record before it of pain, suffering, and mental anguish endured by Mr. Phillips and future pain and suffering, but not of permanent injury, all proximately caused by Defendant's medical care providers failing to act within the standard of care when treating Mr. Phillips's patella tendon injury.

91. The Court finds that Mr. Phillips is entitled to damages for pain, suffering, and mental anguish in the amount of $15,000.00 and future pain and suffering in the amount of $10,000.00.

92. The Court determines that Mr. Phillips is entitled to judgment against the United States of America in the amount of $25,000.00.

It is so ordered this 30th day of March, 2024.

_____
Kristine G. Baker
Chief United States District Court Judge